Michael L. Rodenbaugh (California Bar No. 179059)
Jonathan Frost (California Bar No. 273189) (appearance pending)
RODENBAUGH LAW
548 Market Street – Box 55819
San Francisco, California 94104
Phone:  (415) 738-8087
Email:  mike@rodenbaugh.com

*Attorneys for SiteTools, Inc. and Philip Ancevski*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| POCKETBOOK INT'L SA, | : | Case No.: 2:20-CV-8708-DMG (PDx) |
| Plaintiff, | : | **DEFENDANTS' NOTICE OF MOTION** |
| vs. | : | **FOR SUMMARY JUDGMENT; POINTS** |
| | : | **OF AUTHORITIES IN SUPPORT** |
| DOMAIN ADMIN/SITETOOLS, INC., [1] and PHILIP ANCEVSKI, | : | **[F.R.C.P. 56]** |
| Defendants. | : | Date:    Jan. 21, 2022 |
| | : | Time:   2 p.m. |
| | : | Judge:  Hon. Dolly M. Gee |
| *AND RELATED COUNTERCLAIMS.* | : | |

_____

[1] Plaintiff has incorrectly named this party "Domain Admin/SiteTools, Inc."

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on January 21, 2022, at 2 p.m. before the Honorable Judge Dolly Gee in the above-referenced court, or as soon thereafter as this matter may be heard, Defendants and Counter-claimants SiteTools Inc. and Philip Ancevski (collectively "Defendants") will move for summary judgment on all pending claims and counterclaims in this action, and on Defendants' laches defense, pursuant to Federal Rule of Civil Procedure 56.

Defendants' motion is based on this Notice and the Memorandum of Points and Authorities contained herein, the files and records in this action, a Reply brief to be filed, argument of counsel, and any other and further matter adduced at hearing or of which the court takes judicial notice.

## STATEMENT RE MEET & CONFER

Until December 6, 2021, Plaintiff did not produce even one single document in response to Defendants' requests for production, which were served September 18, 2021, and which production was requested in writing many times since they were due October 18, 2022.  On December 6, Plaintiff produced more than 15,000 pages of documents.  Of those, more than 13,000 pages were (improperly) designated "Attorneys' Eyes Only".   Upon review of those documents, on December 13, Defendants' counsel promptly requested Plaintiff's counsel to meet and confer about this motion at any time on December 13, 14, or 15.  To date, Plaintiff's counsel has not responded to that request.

1
2

# **TABLE OF CONTENTS**

3
4

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 1

5

I.       STATEMENT OF FACTS ........................................................................................ 2

6

II.      ARGUMENT .............................................................................................................. 2

7

    A.  *All of Plaintiff's Claims Fail Because Plaintiff Never Owned or Acquired a Valid Mark in the U.S., and Has No Right to Sue for Past Infringement* ........................................... 3

8
9

    B.  *SiteTools' Domain Registration Precedes Plaintiff's Trademark Use; Thus, Plaintiff's Anti-Cybersquatting Protection Act Claim Fails* ................................................ 22

10
11

    C.  *Defendants Cannot Prove Trademark Infringement* ................................................ 27

12

    D.  *Plaintiff Cannot Prove Unfair Competition Under Any Theory* .............................. 28

13
14

    E.  *Plaintiff Has Not Proved Any Element of Fraud to Support Cancellation of Defendant's Trademark Registration* ................................................. 29

15

    F.  *Plaintiff's Trademark Registrations Must Be Cancelled* .......................................... 29

16

    G.  *All of Plaintiff's Claims Are Barred By Laches* ....................................................... 30

17

    III.     *CONCLUSION* ................................................................................................. 31

18
19
20
21
22
23
24
25
26

1

2

**TABLE OF AUTHORITIES**

3

<u>Cases</u>

4

*AirFX.com v. AirFX LLC*, 2013 WL 857976 (D. Az. 2013)................................. 14, 15

5

*AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348 (9th Cir. 1979)....................................21, 23, 26

6

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986 ............................................................7

7

*Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994)................................. 26

8

*Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842-43 (9th Cir. 2002) ........................................21, 23, 24

9

*Daniel J. Quirk, Inc. v. Village Car Co.*, 120 U.S.P.Q.2d 1146, 1148, 2016 WL 6136609

10

(T.T.A.B. 2016)………..26

11

*Danjaq LLC v. Sony Corp.,* 263 F.3d 942, 951 (9th Cir. 2001)....................................28, 29, 30

12

*Dent v. Lotto Sport Italia SpA*, 2021 WL 242100, *6-10 (D. Ariz. Jan. 25, 2021)............... 14, 15

13

*Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 (9th Cir. 2002)................................. 22

14

*Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 996 (9th Cir. 2001)............................................. 27

15

*George W. Luft Co. v. Zande Cosmetic Co.,* 142 F.2d 536, 541 (2d Cir. 1944) ................. 11, 12

16

*GoPets Ltd. v. Hise*, 657 F.3d 1024, 1030 (9th Cir. 2011) ............................................13, 14, 15

17

*Grupo Gigante SA De CV v. Dallo &Co., Inc.*, 391 F.3d 1088, 1105 (9th Cir. 2004)............... 29

18

*H & J Foods, Inc. v. Reeder*, 477 F.2d 1053, 1056 (9th Cir. 1973)..................................... 11, 12

19

*Herbalife Int'l, Inc. v. Lumene N. Am. LLC*, 2007 WL 4225776, at *3 (C.D. Cal. 2007) ........... 22

20

*HMS Stores, LLC v. RGM Dist., Inc.,* 2015 WL 1299750, *2 (C.D. Cal. 2015) .................. 14, 15

21

*In re Bose Corp.*, 580 F.3d 1240, 1243, 91 U.S.P.Q.2d 1938 (Fed. Cir. 2009)........................ 27

22

*In re DNI Holdings Ltd.*, 77 U.S.P.Q.2d 1435, 2005 WL 3492365 (T.T.A.B. 2005) ................... 9

23

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002)............... 28, 29

24

*Mister Donut of America v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir. 1969)................... 8, 28

25

*Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 670 (7th Cir. 1982)............................ 10, 28

26

*Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 936 (9th Cir. 2015)....................... 25

*Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999)..........................................24

*Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993)...................................26

*Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444, 16 U.S.P.Q.2d 2015, 18 Fed. R. Serv. 3d 1013
(9th Cir. 1990)...........................................................................................................27

*Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1218 (9th Cir.1987) ...........................22

*RSI Corp. v. IBM Corp.*, 2012 WL 3277136, at *15 (N.D. Cal. 2012) .....................................29

*Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F.Supp.2d 1096, 1117 (N.D. Cal. 2008) .............29

*Servpro Indus. Inc. v. Zerorez of Phoenix LLC*, 339 F. Supp. 3d 898, 908 (D. Az. 2018).... 24, 25

*Stegall v. Citadel Broad. Co.,* 350 F.3d 1061, 1065 (9th Cir. 2003)............................................7

*Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005) .....................21, 23

*Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1153 (9th Cir. 2008) .........................27

*United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97-98 (1918).....................................8

**Statutes**

15 U.S.C. § 1125(d)...................................................................................................... 14, 16

15 U.S.C. § 1125(d)(1) ...................................................................................................... 13

15 U.S.C. §1056(a)............................................................................................................... 9

15 U.S.C. §1125(d)(1)(B)(ii) ............................................................................................. 15

TMEP §§1213, 1213.03(a). .................................................................................................. 9

**References**

McCarthy on Trademarks and Unfair Competition § 31:66 (5th ed.);......................................27

McCarthy on Trademarks and Unfair Competition § 18:24 .................................................28

## MEMORANDUM OF POINTS & AUTHORITIES

Defendants hereby move for Summary Judgment on all claims and counterclaims in this action.  Because Plaintiff did not own and/or acquire any valid United States trademark rights, and all of Plaintiff's claims are based on such alleged but abandoned trademark rights, all of Plaintiff's claims fail.  In addition, Plaintiff cannot prove cybersquatting under the Anti-cybersquatting Consumer Protection Act ("ACPA"), nor trademark infringement under the Lanham Act, and thus also cannot prove Unfair Competition under the Lanham Act, common law or California law.  Defendants also move for judgment dismissing Plaintiff's claim for cancellation of Defendants' Pocketbook.com trademark registration, and for judgment on Defendants' counterclaim for cancellation of Plaintiff's Pocketbook trademark registrations due to abandonment.  Finally, Defendants move for judgment on their affirmative defense of laches.

### 1.  STATEMENT OF FACTS

Defendants rely upon their Statement of Uncontroverted Facts and Conclusions of Law, and on the Declaration of Philip Ancevski, filed herewith and incorporated herein by reference. Those uncontroverted facts are repeated below, with reference to the Declaration and to supporting Exhibits filed herewith.

The <pocketbook.com> domain name was originally registered in 1997.  [Exh. 1, WHOIS record.].  Defendant SiteTools acquired the domain name in or about May, 2010.  [Ancevski Decl., #2.]  It then promptly applied for trademark registration of Pocketbook.com and developed an investor pitch, business plan, website and lead generation platform, and engaged in customer acquisition and sales for several years.  [*Id.* #6.]  Defendants never received any complaint about such activities until Plaintiff's UDRP complaint in 2019.  [*Id.*, #9.]

2. **ARGUMENT**

The summary judgment procedure is designed to isolate and dispose of factually or legally unsupported claims. *E.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Under Rule 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Additionally, under Rule 56(c)(1), a party disputing a fact "must support the assertion" by "citing to particular parts of materials in the record, including depositions, documents, ... affidavits or declarations," or by "showing that the materials cited do not establish the absence ... of a genuine dispute."

On a motion for summary judgment, the court must accept undisputed facts as true. *See, e.g., Stegall v. Citadel Broad. Co.,* 350 F.3d 1061, 1065 (9th Cir. 2003). When the nonmoving party bears the burden of proving the claim or defense, the moving party need not produce any evidence or prove the absence of a genuine issue of material fact. *See, e.g., Celotex*, 477 U.S. at 325. Rather, the moving party's initial burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

A.    **All of Plaintiff's Claims Fail Because Plaintiff Never Owned or Acquired a Valid Mark in the U.S., and Has No Right to Sue for Past Infringement**

Plaintiff pleads two design mark registrations as the basis for all of its claims. [Complaint, #14-16.] They are both inapposite as design marks registered after the domain name was registered, and as design marks unlike Defendant's mark. But in any event, Plaintiff has not proved that it owned any trademark registration in the United States prior to 2020,

when the two pleaded registrations were assigned to it.  Those assignments both were "in gross" and thus invalid, resulting in abandonment of any rights purportedly assigned.

Plaintiff was not the applicant for either of those design mark registrations.  The first registration was purportedly assigned in July 2010, from the original registrant Western Graphics Inc., to Plaintiff's purported predecessor-in-interest Pocketbook USA Inc.  But, that was an assignment-in-gross <u>and</u> did not provide that assignee the right to sue for past infringement.  Then, the last assignment, from Batmore Capital to Plaintiff in 2020, suffered the same defects.  As to the second registration, no assignment to Plaintiff is recorded at all.

Both of the recorded assignments were "in gross" as the documents do not mention the transfer of any appurtenant business assets, and Plaintiff has provided no evidence of any such transfer.  *See, e.g., United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97-98 (1918) ("There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed."); *Mister Donut of America v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir. 1969) ("The law is well settled that there are no rights in a trademark alone and that no rights can be transferred apart from the business with which the mark has been associated.").  So, to the extent those registrations represented valid United States trademark rights, those rights were abandoned as a matter of law when they were nakedly assigned to Plaintiff and/or earlier to Pocketbook USA Inc.

Because Plaintiff does not own any valid United States trademark registration or rights, which have been abandoned, and all of Plaintiff's claims are based on such alleged trademark rights, all of Plaintiff's claims fail.  Further, because any such rights were not transferred to it (and/or abandoned) via 'in gross' assignment, Plaintiff's registration nos. 3675976 and 4820128 must be cancelled.

### 1.   2009 Design Mark Registration

Plaintiff relies primarily on its purported ownership of U.S. trademark registration no. 3675976, issued September 1, 2009, for the below design mark.  [Exh. 2, certificate.]



However, that registration disclaims any exclusive rights to the word:  "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "POCKETBOOK" APART FROM THE MARK AS SHOWN".  Thus, it only protects design features – defined as "an open-ended ellipse, representing a stylized profile of a book" with a green/black color scheme -- that are <u>not</u> at issue in this case, as Defendants never used any such features.  [Ancevski Decl., #3.]

Therefore, this registration cannot provide any relevant rights to Plaintiff.  Indeed, this registration is the precise <u>opposite</u> of evidence of rights in the word POCKETBOOK -- apart from the presentation shown in that registration.  The purported predecessor to the Plaintiff's disclaimed the word "POCKETBOOK" from the registration as descriptive matter.  As shown in the USPTO Office Action initially refusing the corresponding application [Exh. 3]:

> Applicant must disclaim the descriptive wording "POCKET BOOK" apart from the mark as shown because it merely describes applicant's goods that are presumed to include pocket sized digital books. See 15 U.S.C. §1056(a); TMEP §§1213, 1213.03(a).   Please see attached web pages discussing applicant's goods as a pocket sized electronic book.

*See, e.g., In re DNI Holdings Ltd.*, 77 U.S.P.Q.2d 1435, 2005 WL 3492365 (T.T.A.B. 2005):

> [I]t has long been held that the disclaimer of a term constitutes an admission of the merely descriptive nature of that term, as applied to the goods or services in connection with which it is registered, and an acknowledgement of the lack of an exclusive right therein at the time of the disclaimer.

Moreover, the applicant for that registration in 2009 was not Plaintiff, it was a Maryland corporation called Western Graphics, Inc.  [Exh. 4, application.]  In October 2010, that company purported to assign "the entire interest and goodwill of Trade Mark POCKETBOOK, reg. #3675976" to a Kansas corporation called Pocketbook USA, Inc.  [Exh. 5, assignment.]  However, that assignor stated shortly thereafter that it "never owned any tangible personal property".  [Exh. 6, Articles of Dissolution.]  *See, Mister Donut USA,* 418 F.2d at 842 ("There was no [transfer of] any customer lists, merchandise, equipment, recipes, decals or other goods.  [So,] the assignor estate had no good will and therefore assigned none."); *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 670 (7th Cir. 1982) (finding an assignment in gross despite language that the mark was assigned "together with the goodwill of the business symbolized by the mark" where the assignee "did not acquire customer lists, real estate, receivables, accounts or any other tangible assets in return for the one dollar consideration it actually paid").

That assignor did not have any business assets to transfer, in order to maintain continuity of any trademark rights.  The documents do not reflect that anything was transferred other than the bare word "goodwill" – not even one dollar.  And anyway, that assignment did not include any right to sue for past infringement -- e.g., for any claims arising from Defendants' domain registration five months prior.

In 2014, Pocketbook USA, Inc. purported to assign only this design mark to a British Virgin Islands company called Batmore Capital Ltd.  [Exh. 7, assignment.]  But, it had nothing to assign because it never received a valid assignment from Western Graphics.  Then, in July 2020, Batmore Capital Ltd. purported to assign only this trademark to Plaintiff.  [Exh.

8, assignment.]  Again, it had nothing to assign, but again that purported assignment was "in gross," as again no assets were transferred, except the bare word "goodwill."

Moreover, the 2020 assignment to Plaintiff also does <u>not</u> include any right to sue for past infringement, and thus Plaintiff is precluded from suing or recovering damages for any alleged injury prior to the date of the first invalid assignment on July 10, 2020.  As a matter of long-settled law, predecessor's assignment of a trademark carries no right to sue for past infringement, unless the assignment explicitly states that it includes such a right.  *E.g., H & J Foods, Inc. v. Reeder,* 477 F.2d 1053, 1056 (9th Cir. 1973) (holding that pre-assignment damages are disfavored, and only allowed when the right to sue is clearly spelled out in the assignment); *citing, George W. Luft Co. v. Zande Cosmetic Co.,* 142 F.2d 536, 541 (2d Cir. 1944) (explaining that an assignment does not convey existing claims for infringement).

Plaintiff filed its Complaint on Sept. 22, 2020.  [Docket #1.].  Because the purported assignment did not give Plaintiff the right to sue for past infringement, it can only sue for infringement that occurred after July 10, 2020, and it only potentially could recover damages for any harm after that date, if any.  However, Plaintiff does not allege any conduct by Defendants in those two months, much less conduct that could possibly amount to cybersquatting, trademark infringement, or unfair competition under any theory.  Moreover, Plaintiff has no standing to cancel SiteTools' trademark registration because it has no valid registration or common law rights to rely upon.  Therefore, all of Plaintiff's claims arising from this registration must be dismissed.

### 2.   2015 Design Mark Registration

Plaintiff also relies on a second U.S. registration no. 4820128, issued Sep. 29, 2015, for the below design mark:

**PocketBook**

But Plaintiff owns nothing here, because Plaintiff was not the applicant for that registration in 2013, either.  The applicant was Batmore Capital Ltd.  [Exh. 9, application.].  The USPTO shows no record of any assignment of that mark to Plaintiff, even though Plaintiff is currently listed as the owner of same.  There is a notation that the International Registration on which the US registration is based was "transferred" effective March 23, 2020.  [Exh. 10, IR Owner Change.]  Yet, Plaintiff has failed to maintain chain of title of the mark in the US, by recording a valid assignment or otherwise.  *See*, 15 U.S.C. Sec. 1050(3) ("Assignments shall be by instruments in writing duly executed.")  In any event, there is no record of any assignment of a right to sue for past infringement, and so Plaintiff cannot sue or recover damages for infringement of this registered mark, either.  *E.g., H & J Foods, Inc.,* 477 F.2d at 1056; *George W. Luft Co.,* 142 F.2d at 541.

Moreover, that application was not filed until 2013 or registered until 2015, several years after SiteTools acquired the <pocketbook.com> domain name and applied to register the Pocketbook.com trademark with the USPTO in 2010 (which was registered in February 2012). [Ancevski Decl., #2; Exh. 11, certificate.].  Therefore, that 2015 registration (even if still valid, which it is not because it was abandoned via assignment in-gross in 2020) cannot create any priority of rights and is wholly irrelevant here.

Additionally, that mark expressly, and only, "consists of the wording "POCKETBOOK" in stylized form with the wording "POCKET" in green and the wording "BOOK" in light gray." Such stylization and color scheme are not at issue in this case, as Defendants never used anything similar.  [Ancevski Decl., #4.]  Therefore, this registration provides no rights upon which Pocketbook can sue or recover damages in this case.

### 3. Plaintiff Has Never Used the Mark in the U.S.

Plaintiff has produced records that a Kansas corporation called "Pocketbook U.S.A. Inc." may have engaged in some commerce in the U.S.  However, Plaintiff has not produced any agreement or other documentation showing any relation between it and that company, or between it (and/or Pocketbook USA) and Batmore Capital, or between Pocketbook USA and Western Graphics.

Indeed, Plaintiff has produced no evidence of any licensing agreement between Plaintiff and any other party.  Since the recorded assignment documents do not indicate any transfer of appurtenant business assets, they are "assignments in gross" (aka "naked assignments"), meaning that the trademark registration was void and abandoned then.  Failure of the Plaintiff to have owned or used the Pocketbook marks in U.S. commerce at any relevant time precludes enforcement of any rights under the ACPA, Lanham Act, or Unfair Competition Law, and prevents Plaintiff from having standing for the purposes of its claim to cancel Defendant SiteTools' Pocketbook.com mark.

### B. SiteTools' Domain Registration Precedes Plaintiff's Trademark Use; Thus, Plaintiff's Anti-Cybersquatting Protection Act Claim Fails

To prevail on its ACPA claim, Plaintiff must prove that the <pocketbook.com> domain name was "identical or confusingly similar to a mark that was distinctive *at the time of registration*" of the domain name.  *E.g., GoPets Ltd. v. Hise*, 657 F.3d 1024, 1030 (9th Cir. 2011) (emphasis in original) (*quoting,* 15 U.S.C. § 1125(d)(1)).  Additionally, the Plaintiff must show that the registrant registered or used the domain in "bad faith".  Or, Defendants may show they are entitled to the "good faith" safe harbor provided in the ACPA because of their reasonable belief as to fair and lawful use.  The incontrovertible evidence proves that Defendants acted in good faith, and thus cannot be found to have acted in bad faith.

### 1. Plaintiff's Mark Did Not Exist When Domain Was Registered

The public WHOIS records show that the <pocketbook.com> domain name was registered in June 1997 [Exh. 1], some <u>eleven years</u> before Plaintiff swore that it first used the "elliptical" design mark in U.S. commerce, in May of 2008. [Exh. 2.] Under these facts, SiteTools prevails as a matter of law on Plaintiff's ACPA claim.

In *GoPets*, the Ninth Circuit held that "registration" of a domain name, for the purposes of 15 U.S.C. § 1125(d), refers only to the "initial registration" which first created the domain name in the DNS. 657 F.3d at 1031–32 ("We see no basis in ACPA to conclude that a right that belongs to an initial registrant of a currently registered domain name is lost when that name is transferred to another owner."). The court concluded: "Because Edward Hise registered gopets.com in 1999, long before GoPets Ltd. registered its service mark, Digital Overture's re-registration and continued ownership of gopets.com does not violate § 1125(d)(1)." *Id.*, at 1032.

Since the *GoPets* decision in 2012, District Courts in the Ninth Circuit have consistently applied and expounded upon the *GoPets* rule. *E.g., AirFX.com v. AirFX*, LLC, 2012 WL 3638721, *3-4 (D. Ariz. Mar. 7, 2013) (dismissing ACPA claim on summary judgment); *HMS Stores, LLC v. RGM Dist., Inc.,* 2015 WL 1299750, *2 (C.D. Cal. 2015) (same, per Rule 12(b)(6)); *Dent v. Lotto Sport Italia SpA,* (same, on summary judgment); *see also, Dent v. Lotto Sport Italia SpA*, 2021 WL 242100, *6-10 (D. Ariz. Jan. 25, 2021) (finding the case 'exceptional' and awarding attorneys' fees to domain owner, finding trademark owner's ACPA claim "unreasonable" and "without merit" -- "as the *AirFX* court concluded, *GoPets* did not limit its holding to parties affiliated with the original registrant of a domain name" – "the Ninth Circuit has not altered its analysis of re-registration since it

published *GoPets*); *accord*, *HMS LLC*, 2015 WL 1299750 at n.2 (*citing*, *AirFX*, 2012 WL 3638721, \*4 (D. Az. 2012) (rejecting argument that *GoPets* was limited to domain name transfers between related parties); *and*, *AirFX.com v. AirFX LLC*, 2013 WL 857976 (D. Az. 2013) (awarding attorneys' fees to domain name owner).

Thus, the *GoPets*, *HMS LLC*, *AirFX.com*, and *Dent* courts each dismissed or denied an ACPA claim because, as in this case, the original domain registration occurred prior to the trademark owner's adoption of its mark.  As indisputably proved, the accused <pocketbook.com> domain name was registered in April 1997, pre-dating Plaintiff's alleged trademark rights by over a <u>decade</u>.  In the *HMS LLC* case, Judge Wilson dismissed an ACPA claim when the domain was registered less than seven <u>months</u> before adoption of the trademark at issue.

Because crystal clear Ninth Circuit law requires the Plaintiff's Pocketbook mark to have been in existence and distinctive prior to the initial creation/registration of <pocketbook.com>, and Plaintiff's Pocketbook mark was not used in the United States until at least a decade later, Plaintiff's ACPA cause of action fails as a matter of law.

### 2. Defendants Have Safe Harbor Under the ACPA Because They Have Reasonably Believed Their Use Was Lawful

Plaintiff is further barred from recovery under the ACPA because there is no genuine issue of material fact whether Defendants acted in bad faith in registering or using the subject domain name.  The ACPA provides a good faith, safe harbor defense to a cybersquatting claim. The statute states that bad faith "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful."  15 U.S.C. §1125(d)(1)(B)(ii).

There is no evidence to suggest that Defendants did not believe, or did not have reasonable grounds to believe, that their registration and use of the domain was fair and lawful.  To be sure, Defendants swear as to their good faith belief at all relevant times. [Ancevski Decl., #5.].  Defendants demonstrated that good faith belief by investing in the domain name, the trademark registration, development of a business plan, investor pitch, website and lead generation platform and customer acquisition – all without any knowledge of Plaintiff nor any complaint from Plaintiff until 2019.  [*Id.*, #6-7, 9; Exh. 12, website; Exh. 21, investor pitch.].  Thus, Defendants had a good faith belief that their use of the domain name was fair and lawful.  [Ancevski Decl., #5.]  Under those circumstances, the belief was reasonable.

### 3.   Plaintiffs Cannot Prove Any "Bad Faith" Factor in Its Favor

Further indicating that their good faith belief was and is indisputably reasonable, Defendants hereby clearly disprove each of the nine 'bad faith' factors enumerated in the ACPA statute.  15 U.S.C. Sec. 1125(d).

### a.   Factors I and II – SiteTools Trademark Rights and Branded Website

Defendant SiteTools owns a corresponding U.S. trademark registration on the Principal Register for the Pocketbook.com mark, stating first use in 2010.  [Exh. 11, certificate.]

> A certificate of registration of a mark upon the principal register … shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate.

15 U.S.C. Sec. 1057(b).  Defendants applied for trademark registration in 2010, received a valid and existing federal registration for the Pocketbook.com mark in 2012 – without disclaimer or design features.  Since then, they have operated a "Pocketbook" branded website at Pocketbook.com [Exh. 12] without any objection from Plaintiff or anyone else then, until 2019.

**b.  Factors III and IV – SiteTools Prior *Bona Fide* Use of Domain**

Defendants have operated a website at the pocketbook.com domain name since at least 2011.  [Exh. 12; Ancevski Decl., #6.]  Defendants' predecessor-in-interest operated a website at that domain name at least in 2003, focusing on educational resources for teachers.  [Exh. 13.]  Thus, both Defendants and their predecessor-in-interest to the domain name operated bona fide websites, fairly used without any infringement of Plaintiff's rights, for years prior to and after Plaintiff alleges trademark rights.  And indeed, Plaintiff never complained until 2019, only after trying many times to buy the name from Plaintiff, further proving the *bona fide* nature or Defendants' site and services.

**c.  Factor V – SiteTools' Lack of Intent to Divert Traffic**

There is no evidence to demonstrate any intent on the part of Defendants to divert customers away from Plaintiff.  Indeed, the parties are engaged in completely different fields of business – there is no rational relationship between Plaintiff's e-reader devices and Defendants' financial services or Defendants' predecessor-in-interest's educational services.  There is no evidence to suggest that consumers of any such products would expect them to be offered by the same sellers.  Common sense dictates otherwise.

The word "pocketbook" has common descriptive meaning in reference to items that can fit into a pocket.  [Exh. 14, dictionary definitions; Exh. 3, Office Action.]  Thus, Complainant's only prior trademark registration included a disclaimer of any exclusive rights to the textual element "pocketbook" in any context.  [Exh. 2.].  Indeed, the word "pocketbook" also has a completely different, yet also common meaning in relation to financial matters.  [Exh. 14.]  That further precludes a finding of bad faith by Defendants in using the domain in connection with

the financial services that SiteTools has offered.  There is no likelihood of confusion, as further

argued *infra.*

### d.  Factor VI – Defendants Did Not Solicit Offers and Had *Bona Fide* Use

There is no evidence that the Defendants solicited to sell the domain to Plaintiff or any

third party.  To the extent Plaintiff indicated the domain might be sold, that only happened after

the domain had been used for *bona fide* purposes both by Defendants and their predecessor-in-

interest, as set forth above.  Defendants never sought out the Plaintiff to sell the Domain to it.

To the contrary, incontrovertible evidence proves that Plaintiff's employees have attempted to

purchase the domain name from Defendants at least four times, each time unsolicited.

The first instance was on February 26, 2013, when someone purporting to be "in charge

of a new web-startup dedicated to electronic readers" contacted Defendant SiteTools "to discuss

possible deal."  [Exh. 15, Shemet email to SiteTools.]  That person was Dmitry Shemet, whose

LinkedIn profile indicates that he was a Vice President of Plaintiff.  [Exh. 16.]  That same day,

Defendant Ancevski replied that "Pocketbook.com is not for sale.  We are in development

process."  [Exh. 15.]

Subsequently on September 26, 2013, Shemet contacted SiteTools again to inquire about

purchasing <pocketbook.com>.  Ancevski replied that SiteTools would sell for $850,000.  [*Id.*]

Nine months later in June 2014, Shemet followed up again, wanting "to know if

pocketbook.com can be considered for sale" as he had "developed the corporate website for

pocketbook and would like to arrange a domain name for them as well."  [*Id.*]  Then, SiteTools

replied that it "could entertain a 6-digit offer" for the domain.  [*Id.*]  Shemet further replied, "6-

digit number is a pretty huge number.  Maybe you can consider 5-digit value that is more

generic for such kind of domains."  [*Id.*].  Then Ancevski replied: "No thanks, I'll pass."

1    After that failed negotiation, Shemet was never heard from again.  Instead, in July 2017,

2    Plaintiff's General Counsel wrote to SiteTools (again unsolicited) and stated: "We are a

3    manufacturer of e-ink readers….   We have discovered that SiteTools has registered and

4    currently maintains the domain name pocketbook.com.  We are interested in purchasing this

5    domain from your company.  We would be prepared to offer you $5,000…." [Exh. 17,

6    Ivanchenko email.]  The next day, SiteTools responded: "This seems like ill-attempt to procure

7    an expensive .com domain and we refuse your offer."  [*Id.*]  Upon follow-up from Plaintiff's

8    General Counsel, who asked for a sales price, SiteTools further responded: "This domain is not

9    for sale, besides, you've greatly underestimated the value of a compound word .com."

10

11    This uncontroverted evidence proves that:  1) Plaintiff did not believe it had any rights to

12    the domain name in 2013, 2014 or 2017, else it would not have initiated offers to purchase the

13    domain, and/or it would have stated some semblance of a legal claim to the name at any of those

14    times; 2) Defendants did not solicit Plaintiff to buy the name, but only responded to Plaintiff's

15    unsolicited inquiries seeking to purchase it; 3) Defendants clearly then believed (and still

16    reasonably believe) that SiteTools owns a very valuable .com domain name property that it was

17    fairly using; and, 4) Plaintiff did not like the price, so turned to "Plan B" cybersquatting

18    allegations instead.

19

20    Plaintiff never sent a 'cease and desist' letter or otherwise accused Defendants of

21    trademark infringement or unfair competition; nor threatened to cancel SiteTools' trademark

22    registration.  Indeed, Plaintiff took no further action until it filed an unsuccessful UDRP

23    complaint in 2019, raising a specious cybersquatting claim.  After they lost that case, they filed

24    this lawsuit, raising even more specious claims.

25

26

DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT          19
Case No. 2:20-CV-8708

### e.   Factor VII – No False Contact Information

There is no evidence that Defendants provided false contact information in connection with its domain name registration, or has any pattern of doing so.

### f.     Factor VIII – No Pattern of Infringing Registrations

There is no evidence that Defendants have registered or acquired multiple domain names which they knew to be identical or confusingly similar to marks of others that were distinctive at the time of registration of such domain names, or dilutive of famous marks.

### g.    Factor IX – Plaintiffs' Mark Not Distinctive or Famous

Even assuming Plaintiff owned a valid mark prior to 2020, which is denied, there is no evidence that Plaintiff's mark is "distinctive and famous" within the meaning of the Lanham Act.  Instead, Plaintiff's purported predecessor-in-interest admitted the word POCKETBOOK was merely descriptive, and thus disclaimed it from its trademark registration.  [Exh. 2, 3.]  And there is evidence that Plaintiff abandoned use of its mark in the U.S. market after 2012.  [Exh. 18, news story.].  Moreover, there is ample evidence of many other uses of the mark POCKETBOOK in the United States, about which Plaintiff has never complained.  [Exh. 19, third-party registrations and uses.].  Thus, there is no possibility that Plaintiff can prove its mark is or was either distinctive or famous in the U.S. at any relevant time.

Thus, because **all nine** of the ACPA "bad faith" factors weigh entirely in favor of Defendants, there can be no genuine issue of material fact as to whether Defendant acted in bad faith in registering or using the Domain.  Instead, all evidence indicates that Defendants and their predecessor-in-interest have always acted in good faith by their use of their own POCKETBOOK (and THE POCKET BOOK) trademarks and branded websites entirely unrelated to e-readers.  For all these reasons, Plaintiff's ACPA claim must be dismissed.

### C.   Defendants Cannot Prove Trademark Infringement

As argued above, Plaintiff does not own any valid trademark registration in the U.S., and cannot rely on any use of its mark prior to 2020.  However, assuming *arguendo* that it owns a mark at all, Plaintiff still must prove both priority and likelihood of confusion in order to prove trademark infringement.  *E.g., Surfvivor Media, Inc. v. Survivor Prods*., 406 F.3d 625, 630 (9th Cir. 2005) (affirming summary judgment -- "To avoid summary judgment …, [a senior mark holder] must raise a material question of fact regarding whether the buying public thought that the [junior mark holder] was either the source of, or was sponsoring" the products in question).

As to priority, SiteTools applied for its mark in 2010 and began operation of its Pocketbook.com website in 2011.  [Exh. 11, 12; Ancevski Decl, #6.]  So, Plaintiff could only rely upon the 2009 registration, but rights in that registration were nakedly assigned twice and thus abandoned, as aforesaid.  Moreover, Plaintiff wrote to Defendants in 2013, stating they were a "new web startup dedicated to e-readers" [Exh. 15], which proves that Plaintiff had little if any business prior to then.  Plaintiff's claim thus fails because it does not have priority of use in the United States, and so cannot prove a core element of its trademark infringement claim.

Assuming *arguendo* that Plaintiff somehow has a valid mark with any priority over SiteTools' mark, it still cannot conceivably prove likelihood of confusion because all of the *Sleekcraft* factors are either neutral or weigh entirely in favor of Defendants.  Ninth Circuit law requires that Plaintiff's evidence create a genuine issue that confusion is "probable, not simply a possibility."  *E.g., Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842-43 (9th Cir. 2002).

In the Ninth Circuit, courts utilize the eight *Sleekcraft* factors to determine whether a likelihood of confusion exists.  *E.g., AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348 (9th Cir. 1979.  Defendants address each factor, in turn.

### 1. Strength of the Plaintiff's Mark

The overall strength of a mark is based on both conceptual strength and commercial strength. A mark's conceptual strength depends on the obviousness of the connection between the mark and the goods or services in connection with which it is used. Conceptual strength is measured on a spectrum of inherent distinctiveness (whether the mark is generic, descriptive, suggestive, arbitrary, or fanciful). The stronger the senior user's mark, the greater scope of protection it receives. *E.g., Herbalife Int'l, Inc. v. Lumene N. Am. LLC*, 2007 WL 4225776, at *3 (C.D. Cal. Oct. 15, 2007) (finding no likelihood of confusion of two "Radiant C" marks):

> Because the message conveyed by a descriptive mark is 'direct and clear,' competitive sellers are likely to need to use the term in describing or advertising their goods. *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1218 (9th Cir.1987). … Although considered distinctive, a suggestive mark is nonetheless a presumptively weak mark that is "entitled to a restricted range of protection." *Sleekcraft,* 599 F.2d at 350.

As already stated, among other things, the dictionary word pocketbook means a wallet, purse, or handbag. [Exh. 14]. Another definition of the word pocketbook is "a book small enough to carry in a coat pocket." [*Id.*]. Thus, far from being either fanciful or arbitrary, and as Plaintiff's purported predecessor admitted in 2009, Plaintiff's use of the Pocketbook mark is merely descriptive of Plaintiff's pocketbook-sized products. Thus, it is weak and unprotectable in the absence of strong evidence of acquired distinctiveness in U.S. commerce. *E.g., Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 (9th Cir. 2002) (holding that a descriptive mark is entitled to trademark protection only if it has become distinctive of the applicant's goods in commerce); 15 U.S.C. §§ 1052(e), (f). Plaintiff has not produced any evidence of that.

### 2. Proximity of the Goods and Services

The proximity or relatedness of the parties' goods or services is a particularly probative likelihood of confusion factor. Confusion is not likely when the goods or services are unrelated,

as in this case.  Related goods or services are those that consumers would reasonably think come from the same source if sold under the same mark.  *E.g., Surfvivor Media*, 406 F.3d at 630.  Moreover, under *Sleekcraft*, when the products are neither competitive nor complementary (as here), the goods and services may only be deemed related to the extent that they are "similar in use and function."  *Sleekcraft*, 599 F.2d at 350.

In this case, SiteTools uses the mark to provide a website in support of mortgage finance products, while Plaintiff sells e-reader devices.  The proximity of these goods and services is so remote that no reasonable jury could find that Defendants' mortgage services site is "similar in use and function" to Plaintiff's line of e-readers.  Thus, it is highly unlikely that any consumer would confuse the Plaintiff's mark and/or goods with the Defendants' mark and/or services.

### 3.  Similarity of the Marks

The importance of this factor depends on the proximity of the parties' goods or services; more similarity is required when the goods or services are entirely unrelated as in this case.  Indeed, even identical marks for similar goods and services may be found not confusable on summary judgement.  *E.g., Cohn,* 281 F.3d at 842-43 (9th Cir. 2002) (holding evidence must create a genuine issue that confusion is "probable, not simply a possibility").

While the words of the marks are similar, Plaintiff's only potentially relevant registration (from 2009) protects only the "elliptic", green/black design feature illustrated therein, which has never been adopted by Defendants.  [Ancevski Decl., #3.].  Plaintiff's 2015 registration includes green and gray colors and distinctive font that have never been adopted by Defendants.  [*Id.*, #4.]  Therefore, any overlapping consumers, if any, would encounter the marks with completely different visual features in the marketplace, mitigating against a finding of confusion.  *See, Cohn*, 281 F.3d at 842.  Moreover, because there is no relatedness of the parties' respective

1    goods and services, this factor is less significant than the first two factors.  *See, id.*

2                                 **4.   Actual Confusion**

3            A lack of evidence of actual confusion strongly indicate that confusion is unlikely, when

4    the parties have co-existed in the marketplace for an extended period of time.  *E.g., Cohn*, 281

5    F.3d at 842 (no likelihood of confusion where marks co-existed for six years without any actual

6    confusion – "some evidence of actual confusion should have become available if Petsmart's

7    coexisting use had created a genuine likelihood of confusion"), *citing, Nabisco, Inc. v. PF*

8    *Brands, Inc.,* 191 F.3d 208, 228 (2d Cir. 1999) (lack of evidence of actual confusion after an

9    ample opportunity for confusion "can be a powerful indication that the junior trademark does

10   not cause a meaningful likelihood of confusion").

11           There is no evidence of any instance of consumer confusion between Plaintiff's and

12   Defendants' marks and/or their respective goods and services, despite them co-existing in the

13   U.S. marketplace for more than a decade.  Therefore, this important factor weighs heavily in the

14   analysis, indicating there is no likelihood of confusion.

15                              **5.   Marketing Channels Used**

16           This factor concerns how and to whom the parties' goods and services are advertised and

17   sold.  The more distant the parties' marketing channels, the less likely it is that confusion may

18   occur.  This factor "does not shed much light on the likelihood of consumer confusion when the

19   two entities use standard channels, such as television, radio, and Internet."  *E.g., Servpro Indus.*

20   *Inc. v. Zerorez of Phoenix LLC*, 339 F. Supp. 3d 898, 908 (D. Az. 2018) (granting summary

21   judgment even though marks were identical).

22           Here, both parties primarily advertise and provide their goods and services via their

23   websites, and more broadly via the internet.  Therefore, this factor is unimportant, and neutral.

**6.  Types of Goods and Purchaser's Degree of Care**

Reasonably prudent consumers are likely to exercise greater care when the consumer has expertise in the field; and the goods are expensive.  *Servpro*, 339 F. Supp. 3d at 909, (*citing, Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 936 (9th Cir. 2015) (affirming summary judgment; finding that "[w]atches costing several hundred dollars [in 2015]" qualify as expensive)).  In this case, the Defendants' customers are mortgage brokers who are sophisticated business customers, and consumers seeking financial advice and mortgage refinance – which they obviously would exercise great care in choosing their provider.  Moreover, the customers of Plaintiff are purchasing goods that are expensive—the Pocketbook e-readers cost hundreds of dollars.  [Exh. 20, Amazon product pages.]  Therefore, this factor weighs heavily against a likelihood of confusion because the parties' unrelated goods and services are utilized by sophisticated consumers and/or are expensive.

**7.  Defendant's Intent**

Defendants had no knowledge of the Plaintiff or its (or predecessor's) e-reader products when it selected the Pocketbook mark.  [Ancevski Decl., #7.]  Moreover, Defendants took many steps to register their mark, invest in their business, and develop their website and related business over the past decade – all without objection from the USPTO or complaint from Plaintiff until 2019.  Indeed, Defendants have never engaged in any business whatsoever related to Plaintiff's business.  [*Id.*, #8.]  Thus, the absence of any bad intent also weighs heavily in favor of the Defendants.

**8.  Likelihood of Product Line Expansion**

If there is no likelihood that either party will expand into the other's market, then confusion is less likely.  *E.g., Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir.

1993) ("The question is whether the parties are likely to compete with a similar product in the same market.").  In this case, Defendant has no intention of competing in the e-reader field, and so is certainly not likely to start producing e-reader devices.  [Ancevski Decl., #8.].  Plaintiff has provided no evidence that it will expand its line of products from e-readers to mortgage refinance tools and lead generation.  No reasonable person would believe that e-readers and mortgage refinance services would be offered by the same proprietors.  Plaintiff has offered no evidence to suggest otherwise.  Thus, this final factor also weighs in favor of Defendants.

Because at least six of the eight *Sleekcraft* factors weigh in favor of the Defendants (and one is neutral), there can be no genuine issue of material fact as to whether there is a likelihood of confusion.  Thus, the court should grant summary judgment denying Plaintiff's trademark infringement claim.

### D.   Plaintiff Cannot Prove Unfair Competition Under Any Theory

Plaintiff's Lanham Act, Sec. 43(a) claim requires that Plaintiff have a valid trademark and that the Plaintiff prove likelihood of confusion between the Plaintiff's mark and the Defendant's mark.  15 U.S.C. Sec. 1125(a)(1)(A).  As argued above, Plaintiff did not have a valid trademark in the US prior to July, 2020.  Moreover, per the discussion of the *Sleekcraft* factors discussed above, Plaintiff's 43(a) claim under the Lanham Act should be dismissed for lack of any genuine issue as to likelihood of confusion.

Likewise, the Ninth Circuit holds that trademark actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act." *Cleary v. News Corp., 30 F.3d 1255, 1262-63* (9th Cir. 1994).  Therefore, Plaintiff's Section 17200 claim also should be denied.

Finally, Plaintiff's "common law unfair competition" claim also fails.  The Ninth Circuit

has concluded that "[t]he common law tort of unfair competition is generally thought to be synonymous with the act of 'passing off' one's goods as those of another." *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1153 (9th Cir. 2008) (affirming dismissal where plaintiff had "not alleged that the Corporation Defendants have passed off their goods as those of another nor that they exploit trade names or trademarks"). Here, there are no allegations that Defendants passed off their services as those of Plaintiff.

### E.   Plaintiff Has Not Proved Any Element of Fraud to Support Cancellation of Defendant's Trademark Registration

The party seeking cancellation of a trademark registration for fraudulent procurement bears a heavy burden of proof. *E.g., In re Bose Corp.*, 580 F.3d 1240, 1243, 91 U.S.P.Q.2d 1938 (Fed. Cir. 2009); *Daniel J. Quirk, Inc. v. Village Car Co.*, 120 U.S.P.Q.2d 1146, 1148, 2016 WL 6136609 (T.T.A.B. 2016) (Fraud must be proven "to the hilt" with clear and convincing evidence. Fraud claim in cancellation proceeding was dismissed.); *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 996 (9th Cir. 2001) (trademark owner "can only be adjudicated to have filed a fraudulent oath if he acted with scienter"). Subjective intent to deceive, however difficult it may be to prove, is an indispensable element in the analysis. 6 McCarthy on Trademarks and Unfair Competition § 31:66 (5th ed.); *see also, Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444, 16 U.S.P.Q.2d 2015, 18 Fed. R. Serv. 3d 1013 (9th Cir. 1990) (fraud in a representation to the USPTO requires "a false representation regarding a material fact, the registrant's knowledge or belief that the representation is false, the intent to induce reliance upon the misrepresentation and reasonable reliance thereon, and damages resulting from the reliance).

Plaintiff has only generally pled fraud "on information and belief", with no supporting facts or citations to evidence. [Complaint, #22, 29.] Discovery has closed, and Plaintiff has produced no evidence to support those generic allegations, nor to support any of the elements set

1  forth by the Ninth Circuit in *Robi*.  On the other hand, Defendants' have provided

2  uncontroverted evidence of their good faith intentions and actions in registering and using the

3  domain name and operating the appurtenant business.  [Ancevski Decl., #5-9; Exh. 12, website;

4  Exh. 21, investor pitch.]  Therefore, this claim must be denied as a matter of law.

5          **F.     Plaintiff's Trademark Registrations Must Be Cancelled**

6          "One can begin with a rule that most courts now accept: The mere fact that the

7  assignment document recites that good will was transferred to the assignee does not control the

8  validity of the assignment."  McCarthy on Trademarks and Unfair Competition § 18:24; *see*

9  *also, Mister Donut USA*, 418 F.2d at 842; *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d at 670.

10 Defendants have shown *supra* that Plaintiff has never owned valid trademark registrations

11 because they were assigned "in gross" to Plaintiff and/or to Plaintiff's purported predecessor-in-

12 interest, without any transfer of appurtenant business assets.  Therefore, Plaintiff's registrations

13 must be cancelled.

14         **G.     All of Plaintiff's Claims Are Barred By Laches**

15         In the Ninth Circuit, "[i]t is well established that laches is a valid defense to Lanham Act

16 claims."  *E.g., Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002)

17 (affirming summary judgment).  A party asserting laches must show that (1) the plaintiff's delay

18 in filing suit was unreasonable, and (2) it would suffer prejudice caused by the delay if the suit

19 were to continue.  *Id*. at 838 (holding that seven-year delay in filing suit was both unreasonable

20 and prejudicial) (*citing, Danjaq LLC v. Sony Corp.,* 263 F.3d 942, 951 (9th Cir. 2001)).

21             **1.     Plaintiff's Delay in Filing Suit Was Unreasonable**

22         Plaintiff knew of Defendant's registration and website at least by 2014 when it

23 contacted Defendant to inquire about purchasing the domain name.  [Exh. 15.]  Plaintiff's

delay cannot possibly be deemed reasonable, as a matter of law.  The reasonableness of the plaintiff's delay is considered in light of the time allotted by the analogous limitations period.  *Jarrow*, 304 F.3d at 838 (finding a 3-year analogous limitations period for trademark infringement claims); *Danjaq*, 263 F.3d at 952 ("Generally speaking, the relevant delay is the period from when the plaintiff knew (or should have known) of the allegedly infringing conduct, until the initiation of the lawsuit in which the defendant seeks to counterpose the laches defense.").

Plaintiff delayed filing suit for more than seven years, at least, since it wrote to Defendants.  Thus, there can be no question that such delay is clearly unreasonable. *See, e.g., RSI Corp. v. IBM Corp.*, 2012 WL 3277136, at *15 (N.D. Cal. 2012) (finding that seven-year delay was unreasonable); *Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F.Supp.2d 1096, 1117 (N.D. Cal. 2008) (granting summary judgement because "the court concludes that plaintiff's delay of at least eighteen years is unreasonable"); *Grupo Gigante SA De CV v. Dallo &Co., Inc*., 391 F.3d 1088, 1105 (9th Cir. 2004) (finding laches from delay of four years); *Jarrow*, 304 F.3d at 839 ("seven-year delay is more than double the time available to file suit under the analogous limitations period.").

### 2. Plaintiff's Delay Has Severely Prejudiced Defendants

The Ninth Circuit recognizes "two chief forms of prejudice in the laches context -- evidentiary and expectations-based.  Evidentiary prejudice includes such things as lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died.  A defendant may also demonstrate prejudice by showing that it took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly. *Danjaq*, 263

F.3d at 955.  Sitetools has suffered both types of prejudice from Plaintiff's unexcused delay in bringing this suit now.

Defendants operated their business for nearly 10 years before hearing any complaints from Plaintiff or anyone else about the use of the Domain.  Indeed, Plaintiff inquired at least three times about purchasing it, without ever raising a legal claim until 2019.  During that time, Sitetools invested substantial effort and planning into its business, and has relied on the revenue that <pocketbook.com> generates.  [Ancevski Decl., #10.]

In addition, Defendants have had to defend against Plaintiff's claim to its this valuable domain property, by proving its business activities and "good faith" as of that time period some ten years ago.  Not many people or businesses can prove in much detail what they were doing 10 years ago, through documentary evidence or otherwise.  Sitetools has located only a small subset of the relevant documents from that time period, as many email, financial and other electronic records were destroyed years ago.  [*Id.*, #11.]  Many witnesses and the vast majority of documents are not available at this time, including mortgage brokers who paid for Defendants' service.  [*Id.*]  Therefore, Defendants have proved their laches defense, such that all of Plaintiffs' claims should be dismissed on that basis, as well.

**III.        CONCLUSION**

For all of the foregoing reasons, Plaintiff requests this Honorable Court to grant summary judgment in Plaintiff's favor on all claims and counterclaims, and on Plaintiff's laches defense.

RESPECTFULLY SUBMITTED,
    /s/ Mike Rodenbaugh
        RODENBAUGH LAW