1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

POCKETBOOK INTERNATIONAL SA,

　　　　　　　　Plaintiff,

　　　　v.

SITETOOLS, INC., and PHILIP
ANCEVSKI,

　　　　　　　　Defendants.

Case No. CV 20-8708-DMG (PDx)

**ORDER RE DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT [52]
AND PLAINTIFF'S MOTION TO
CONTINUE TRIAL AND PRETRIAL
DATES [45]**

　　　　Before the Court is Defendants SiteTools, Inc. and Philip Ancevski's Motion for Summary Judgment ("MSJ") [Doc. # 52]. The MSJ is fully briefed. [Doc. # 60 ("Opp."), 64 ("Reply").] The Court held a hearing on the MSJ on January 28, 2022. Also before the

-1-

Court is Plaintiff Pocketbook International SA's Motion to Continue Trial and Pretrial Dates. [Doc. # 45.] That motion is also fully briefed. [*See* Doc. ## 53, 56.]

For the following reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' MSJ. The Court also **GRANTS** Pocketbook's Motion to Continue.

## I.

## PROCEDURAL BACKGROUND

Pocketbook[1] filed its Complaint in this Court on September 22, 2020, asserting claims for (1) trademark infringement under the Lanham Act, (2) trademark dilution under the Lanham Act, (3) unfair competition under the Lanham Act, (4) cybersquatting under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), (5) common law trademark infringement, (6) violation of California's Unfair Competition Law ("UCL"), and (7) cancellation of a trademark registered by Defendants. [Doc. # 1.] On October 29, 2020, Pocketbook dismissed its claim for trademark dilution without prejudice. [Doc. # 14.] Defendants moved on October 30, 2020 to dismiss Pocketbook's ACPA claim on the basis that it was barred by collateral estoppel, since the issue of bad faith had been litigated by a dispute resolution panel of the Uniform Domain Name Dispute Resolution Policy ("UDRP"). [Doc. # 15.] The Court denied Defendants' motion to dismiss, finding the UDRP claim did not preclude this Court's consideration of the same issue. [Doc. # 23.]

Defendants filed their Answer on April 28, 2021. [Doc. # 25.] Defendants' Answer asserted 13 affirmative defenses, including laches, and asserted counterclaims for (1) abandonment of trademark, (2) reverse domain name hijacking, and (3) unfair competition under the UCL. On May 19, 2021, Pocketbook filed a motion to strike Defendants' UCL claim pursuant to California's Anti-SLAPP statute, dismiss Defendants' counterclaims under Rule 12(b)(6), strike references to the UDRP proceedings and rulings in the counterclaim, and strike the affirmative defenses under Rule 12(f). [Doc. # 27.] On

---

[1] This Order refers to multiple Pocketbook entities throughout. References to "Pocketbook" refer to Plaintiff Pocketbook International SA.

October 19, 2021, the Court issued an order dismissing, with leave to amend, the reverse domain name hijacking counterclaim and the UCL claim, striking a quotation from the UDRP panel decision from the counterclaim, and striking Defendants' affirmative defenses of failure to state a claim, lack of damages, unjust enrichment, frivolous claims, and right to amend. [Doc. # 37.]  The Court otherwise denied Pocketbook's motion.  On November 9, 2021, Defendants filed a notice that they would not amend their UCL and reverse domain name hijacking claims.    [Doc. # 38.]    Pocketbook filed its Answer to Defendants' counterclaims on November 30, 2021.  [Doc. # 43.]

While Pocketbook's motion to strike and dismiss was pending, the Court entered a scheduling order providing for a non-expert discovery cut-off of December 14, 2021, and a motion filing cut-off of December 17, 2021.  [Doc. # 34-1.]  On December 3, 2021, Pocketbook filed its motion to continue the pretrial and trial dates in this matter, seeking to extend the case deadlines in order to conduct additional discovery.  Pocketbook noticed the motion for hearing on January 7, 2022.[2]  On December 17, 2021, Defendants filed their MSJ.

## II.

## FACTUAL BACKGROUND[3]

### A.    Pocketbook and its Trademarks

Pocketbook owns two trademarks that involve the word "pocketbook."  SUF 5.  The first trademark, No. 3675976, was issued September 1, 2009.  SUF 6.  The second trademark, No. 4820128, was issued September 29, 2015.  SUF 16.

---

[2] Pocketbook noted in its motion that it was unable to notice the motion for hearing sooner because of holiday court closures.

[3] Citations herein refer to Defendants' Response to Plaintiff's Statement of Genuine Disputes ("SUF") [Doc. # 65].  Unless otherwise stated, the material facts in this section are uncontroverted.  The Court deems facts to be uncontroverted where a party does not provide evidence to support the alleged dispute.

### 1.   Pocketbook's E-Readers

Pocketbook began advertising and marketing e-readers in the United States on May 5, 2008, and began selling e-readers in September 2008.  Konovalov Decl. ¶¶ 15-16 [Doc. # 60-2].  Pocketbook's CEO, Andrey Konovalov, attended the 2011 Consumer Electronics Show, or CES, to display Pocketbook's products.  On November 12, 2012, a website called Good E-Reader published an article reporting that in the previous six months, Pocketbook had "abandoned the USA market completely."  [Doc. # 52-7 at 5.]  Konovalov asserts, to the contrary, that Pocketbook has sold e-readers in the United States every year from 2009-2010 and from 2013-2021.  Information for 2011 and 2012 does not appear in the record.  *See* Konovalov Decl., Exs. 3, 6 [Doc. # 67].

### 2.   Mark No. 3675976

When Pocketbook applied for this mark, the United States Patent and Trademark Office ("USPTO") initially refused Pocketbook's application, stating:

> Applicant must disclaim the descriptive wording 'POCKET BOOK' apart from the mark as shown because it merely describes applicant's goods that are presumed to include pocket sized digital books.  See 15 U.S.C. §1056(a); TMEP §§1213, 1213.03(a).  Please see attached web pages discussing applicant's goods as a pocket sized electronic book.

SUF 8.  The USPTO registration for the mark issued September 1, 2009 includes such a disclaimer:

> NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "POCKETBOOK", APART FROM THE MARK AS SHOWN.

SUF 7; [Doc. # 52-5 at 6].[4]  The trademark was registered by a Maryland corporation called Western Graphics, Inc.  SUF 9.  In October 2010, Western Graphics, Inc. assigned "the entire interest and goodwill" of the trademark to a Kansas Corporation called Pocketbook

---

[4] Page references cited herein refer to the page numbers inserted by the CM/ECF system.

USA, Inc.  SUF 10.  In articles of dissolution dated July 9, 2012, the president of Western Graphics, Inc. attested that the corporation "has never owned any tangible personal property and therefore no tangible personal property reports are due."  SUF 11; *see also* [Doc. # 52-5 at 25].  In 2014, Pocketbook USA, Inc. assigned the trademark to Batmore Capital Ltd.  SUF 13.  In July 2020, Batmore Capital Ltd. assigned the trademark to Plaintiff Pocketbook.  SUF 14.

### 3. Mark No. 4820128

Batmore Capital Ltd. applied for Mark No. 4820128 on February 28, 2013, and it was issued on September 29, 2015.  SUF 16, 17; [Doc. # 52-6 at 13].  The USPTO does not have a record of the assignment of that mark to Pocketbook, but Pocketbook is currently listed as the owner.  SUF 18.

## B. Pocketbook.com

The domain name "Pocketbook.com" was first registered in 1997.  SUF 1.  Defendants' predecessor operated a website at Pocketbook.com beginning in at least 2003, focusing on educational resources for teachers.  SUF 27.  SiteTools acquired the domain name in or about May 2010.  SUF 2.  There is nothing in the record explaining how the domain name was used between 2004 and Defendants' acquisition of the website.

SiteTools filed a trademark application for "Pocketbook.com" on July 20, 2010.  SUF 3.  On February 8, 2011, Pocketbook.com displayed a list of "Sponsored Listings" providing links to various websites, including Amazon.com/kindle, BarnesandNoble.com/NOOK/Accessories, and three websites offering consumers guides to e-readers.  A column of "Related Topics" provided a list including "EBook Reader," "Pocketbook," "Kindle Reader," and "Sony Reader."  [Doc. # 60-11 at 53.]  On September 30, 2011, Pocketbook.com displayed an error message displaying a Google logo and stating "404.  That's an error.  The requested URL was not found on this server."  *Id.* at 54.  As of October 31, 2011, Pocketbook.com displayed a list of links with the headings "Finance," "Credit Cards," Investing," and "Credit Report."  *Id*. at 55.

On December 2, 2011, Pocketbook.com displayed links to "Finance," "Investing," and "Credit Cards," as well as a link to "Inquire about this Domain." *Id.* at 56. The site displayed similar links on December 2, 2011 and November 6, 2012. *Id*. at 57-58. As of January 4, 2014, the site redirected to www.refinancemortgage.com. *Id*. at 61. As of January 31, 2022, the site continues to redirect to www.refinancemortgage.com, to a landing page titled "Pocketbook ®."

## C.   Pocketbook's Offer to Purchase Pocketbook.com

On February 26, 2013, Dmitry Shemet, a Pocketbook employee, contacted Defendant Ancevski, CEO of SiteTools, seeking to "contact the owner of pocketbook.com domain to discuss possible deal." SUF 36; [Doc. # 52-6 at 38]. Ancevski replied that Pocketbook.com was not for sale and stated "we are in development process." SUF 37.

On September 26, 2013, Shemet emailed Ancevski again to ask if Ancevski had "changed [his] position regarding pocketbook domain name." [Doc. # 52-6 at 40.] Ancevski offered to sell Pocketbook.com, including the trademark, for $850,000. Ancevski stated his offer did not include "the web application we've been working on." *Id*.

On June 9, 2014, Shemet emailed once more to ask "if domain pocketbook.com can be considered for sale." SUF 39. Ancevski replied, "Please let me know if you are a domain broker and/or what is the reason for your interest?" [Doc. # 52-6 at 37.] Shemet said he was the head of an R&D company that had developed the corporate website for Pocketbook and wanted to arrange a domain name for them. [Doc. # 52-6 at 36.] In reply, Ancevski offered to entertain a six-digit offer for Pocketbook.com. Shemet proposed a five-digit offer, and Ancevski refused. *Id*.

On July 26, 2017, Pocketbook's general counsel, Yaroslav Ivanchenko, emailed Ancevski. Ivanchenko wrote (in relevant part):

> Our company is a manufacturer of e-ink readers marketed under the trademark "PocketBook" and has for many years owned and operated business under the name "POCKETBOOK". Also, we are an exclusive licensee of the trademark

"PocketBook" (international trademark registrations No 1199701, No 1223039, No 1034872, U.S. registrations No 4820128 and No 3675976). We have discovered that SiteTools Inc. had registered and currently maintains the domain name pocketbook.com. We are interested in purchasing this Domain Name from your company. We would be prepared to offer you US$ 5 000 for the Domain Name pending all terms are agreeable.

[Doc. # 52-7 at 3.] Ancevski replied:

We also hold trademark on "Pocketbook" USPTO registration number 4099793[.] This seems like ill-attempt to procure an expensive .com domain and we refuse your offer.

*Id.* at 2. Ivanchenko asked for a price that would be acceptable to Ancevski. Ancevski did not respond, and Ivanchenko followed up on August 17, 2017. Ancevski replied "This domain is not for sale, besides, you've greatly underestimated the value of a compound word .com." *Id.*; *see also* SUF 41.

In addition to Pocketbook.com, Defendants have registered hundreds of domain names, such as publichousingauthority.com, iwanttoliveforever.com, and brickproductions.com. Konovalov Decl., Exs. 15, 16. Ancevski has previously been found, in a UDRP proceeding, to have registered and used in bad faith a domain name in which he had no legitimate interests and which was "identical or confusingly similar to" a trademark owned by someone else. *See Terwin Holdings LLC dba The Winter Group v. Philip Ancevski*, Case No. D2006-1035, at *11, 2006 UDRP LEXIS 768 (WIPO Arb. and Med. Ctr. October 9, 2006).

## III.

### REQUEST FOR JUDICIAL NOTICE

Pocketbook asks the Court to take judicial notice of 46 exhibits ("RJN"). [Doc. # 60-8.] Pocketbook requests judicial notice of (1) the California Secretary of State's entry for SiteTools, Inc., (2) decisions from adjudications by the UDRP and arbitrations, (3) documents retrieved from the USPTO website and actions taken by the USPTO, (4) online

press coverage of Pocketbook, (5) entries from Pocketbook's website, (6) archives from the Internet Archive's Wayback Machine, and (7) screenshots of sitetools.com.

Defendants object to Pocketbook's RJN insofar as Pocketbook asks the Court to take judicial notice of government records and judicial or administrative proceedings "for [the] veracity of the documents or any statements within the documents." Defendants' Objection to Pocketbook's RJN [Doc. # 66]. Defendants also object to Pocketbook's request for judicial notice to the extent Pocketbook asks the Court to take notice of the contents of certain third-party websites, which Defendants assert are not capable of accurate and ready determination. Insofar as the Court grants Pocketbook's RJN as to these documents, the Court does not do so for the truth of their contents.

Pocketbook's RJN is **GRANTED** as to the documents retrieved from the USPTO website and actions taken by the USPTO,[5] online coverage of Pocketbook,[6] the UDRP decision in *Terwin Holdings*, and archives from the Internet Archive's Wayback Machine.[7] Because the Court does not rely on the other documents for which Pocketbook seeks judicial notice in rendering this decision, Pocketbook's RJN is otherwise **DENIED as moot**.

## IV.

## EVIDENTIARY OBJECTIONS

Pocketbook interposes evidentiary objections to Defendants' evidence in support of each of Defendants' proposed undisputed facts, including facts which Pocketbook agrees are undisputed. Indeed, Pocketbook asserts that Defendants' evidence is "all inadmissible." Pocketbook's Evidentiary Objections at 3 [Doc. # 60-6]. Such blanket objections are abusive, frivolous, and inappropriate make-work. The Court admonishes

---

[5] RJN Exhibits E, F, G, H, U, V, Z, EE, FF, and SS [Doc. ## 60-9, 60-10, 60-11].

[6] RJN Exhibits I, J, K, P, Q, R, and S [Doc. ## 60-9, 60-10].

[7] RJN Exhibits W and Y [Doc. # 60-11].

Pocketbook's counsel that future filings that interpose such flagrantly meritless blanket evidentiary objections will not only be summarily denied but will also result in the imposition of monetary sanctions.

To the extent Pocketbook objects to evidence on which the Court does not rely, Pocketbook's objections are **OVERRULED as moot**.  Further, the Court need not address in detail vague, boilerplate evidentiary objections lodged at each of Defendants' 61 SUFs without any explanation and not targeted at any specific evidence.  *See Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1033 (C.D. Cal. 2013) ("All of the parties' objections are boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence. . . .  On this basis alone, the Court will not scrutinize each objection and give a full analysis of identical objections raised as to each fact.").

The Court also notes that Pocketbook objects to evidence introduced by Defendants while *in the same filing* offering the same or similar evidence in support of its opposition. For example, Pocketbook objects to an action from the USPTO refusing Pocketbook's trademark application on the basis that the "statements" made by the USPTO are hearsay, *see* Pocketbook's Evidentiary Objections, SUF 8, yet Pocketbook asks this Court to take judicial notice of the same type of action from the USPTO.[8]  To the extent Pocketbook raises relevance objections to facts specifically discussed herein, the objections are **OVERRULED**.   Otherwise, Pocketbook's boilerplate objections on the basis of relevance, hearsay, and Rule 403 are **OVERRULED** in their entirety.

Pocketbook objects that Ancevski lacks the personal knowledge necessary to attest to the facts in his declaration attached to the MSJ, including the date on which SiteTools acquired the Pocketbook.com domain name.  *See* Pocketbook's Evidentiary Objections,

---

[8] The Court does not rely on any statements contained in the USPTO action for their truth, and this objection is therefore **OVERRULED**.  Even if it did rely on USPTO records, however, they are admissible as public records.  *See* Fed. R. Evid. 803(8)(A)(i).

SUF 2; *see also* Pocketbook's Objections to Declarations [Doc. # 60-7]. Ancevski attests that he is the CEO of SiteTools and has been since its incorporation. Ancevski Decl. ¶ 1 [Doc. # 52-1]. The Court has reviewed Ancevski's declaration and has identified no statement about which Ancevski, as the CEO of SiteTools, is unqualified to testify. Pocketbook's objection to Ancevski's declaration on this basis is **OVERRULED**.

Pocketbook likewise objects to the declaration of Defendants' counsel, Michael Rodenbaugh, authenticating the exhibits attached to Defendants' MSJ. *See* Pocketbook's Objections to Declarations [Doc. # 60-7]. Pocketbook objects on the basis that Rodenbaugh's statements authenticating the exhibits attached thereto are hearsay, irrelevant, and lack foundation. Pocketbook's objections are meritless and are **OVERRULED**.

Defendants do not raise any objections under the Federal Rules of Evidence. Defendants do object, however, pursuant to Federal Rule of Civil Procedure 37(c) to Pocketbook's introduction in support of its Opposition of a document assigning Batmore Capital Ltd.'s intellectual property rights to Pocketbook. Defendants object to Pocketbook's introduction of this exhibit on the basis that Pocketbook failed to produce this document during discovery, despite Defendants' request that Pocketbook do so. The Court does not rely on this evidence, and Defendants' request to exclude this evidence is therefore **DENIED** as moot.

## V.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Id.*

## VI.

### DISCUSSION

Defendants move for summary judgment on all claims and counterclaims and on Defendants' affirmative defense of laches. Pocketbook argues in opposition that there are disputed issues of material fact, Defendants' MSJ should be denied for failure to comply with the Local Rules, and Defendants' MSJ should be denied pursuant to Federal Rule of Civil Procedure 56(e).

**A.      Pocketbook's Request for Denial for Failure to Comply with Local Rules**

Pocketbook asks the Court to deny Defendants' MSJ on the basis that Defendants failed to comply with Local Rule 7-3 (requirement to meet and confer before filing), 11-3.1.1 (minimum 14-point font), and 11-6 (25-page limit for memoranda of points and authorities). Defendants appear to have failed to meet and confer in their rush to file their MSJ in advance of the deadline. Defendants should have complied with the Local Rules and with the Court's Standing Order, which requires compliance with Rule 7-3.

Nevertheless, Defendants state they contacted Pocketbook's counsel five days before the motion was filed seeking to meet and confer, and that Pocketbook did not respond.  In addition, while Defendants used a 12-point font in their MSJ, they appear to have used line spacing that provided for *fewer* than 28 lines on each page.  This observation, and the fact that Defendants used a 14-point font in their Reply (after Pocketbook pointed out the error), leads the Court to conclude that Defendants did not use a smaller font in an effort to evade the page limitation.  Although the Court will excuse Defendants' failure to comply here in order that it can proceed to address issues on the merits that the parties already have fully briefed, the Court admonishes Defendants that future filings that fail to comply will be rejected.

**B.     Trademark Infringement**

Any party that "uses" the trademark of another in connection with the sale, offering for sale, or distribution of goods is liable for trademark infringement.  15 U.S.C. § 1114(1).  To establish patent infringement, a plaintiff must prove (1) that it has a valid, protectable trademark; and (2) that the defendants' use of the trademark is likely to cause customer confusion.  *Applied Info. Sciences Corp. v. eBAY, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007).

**1.     Validity of Pocketbook's Trademarks**

Defendants argue that Pocketbook's trademarks are invalid because the prior assignments Mark No. 3675976 were assignments in gross, and Pocketbook has therefore abandoned the marks.  Because the validity of Pocketbook's marks is a threshold issue for Pocketbook's infringement claims, the Court will address this issue first.

**a.     Assignments in Gross**

"[T]he law is well settled that there are no rights in a trademark alone and that no rights can be transferred apart from the business with which the mark has been associated."  *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1289 (9th Cir. 1992) (quoting *Mister Donut of Am., Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir. 1969)).  Instead, a mark must be assigned "with the goodwill of the business in which the mark is used, or with that part of the goodwill of the business connected with the use of and

symbolized by the mark." *Id*. (quoting 15 U.S.C. § 1060).  The purpose of this rule is to avoid deceiving or confusing consumers by transferring a mark without maintaining continuity of the goods or services associated with the mark.  *Id*.

Defendants argue that the assignment from Western Graphics to Pocketbook USA was an assignment in gross because, although the agreement assigning the mark contained a recital that the mark was assigned along with the goodwill associated with the mark, Western Graphics later asserted that it "never owned any tangible personal property."  *See* MSJ at 10.  The case law does not demonstrate, however, that tangible personal property must be transferred to effect a transfer of goodwill.  For example, "information sufficient to enable [the assignee] to continue" the business the assignor was conducting prior to the assignment may constitute a transfer of goodwill.  *See Gallo*, at 967 F.2d at 1289.

Pocketbook has introduced evidence in the form of a declaration from Konovalov that Pocketbook USA became "the successor in all the rights of Western Graphics," and that "at the time of Western Graphics' dissolution, all of its assets had been transferred to its successor in interest Pocketbook USA."  Konovalov Decl. ¶¶ 4, 6.  Konovalov further explains that Batmore Capital "became the successor in all rights of Pocketbook USA," and that in 2019 Plaintiff became "the successor in all rights of Batmore Capital."  *Id*. at ¶¶ 9-10.  Konovalov also describes Pocketbook's operations in the United States, beginning in 2008 and continuing through the present day.[9]  These statements are sufficient to create a dispute of fact to defeat a motion for summary judgment:  Konovalov's statements describe the assignment of *all* of Pocketbook's business, not merely the assignment of its trademarks.[10]  Moreover, none of Defendants' evidence suggests that the transfer of Mark

---

[9] It is not clear from Konovalov's declaration to which Pocketbook entity he is referring in paragraphs 15 through 21. This is not important, however, for purposes of understanding the company's activities in the United States during the relevant period.

[10] Defendants object that Konovalov's statements are self-serving, but as the Ninth Circuit has observed, "declarations are often self-serving, and this is properly so because the party submitting it would

-13-

No. 3675976 had the effect of deceiving or confusing customers.  Defendants have not established an absence of triable issues as to whether the assignment of Mark No. 3675976 was an assignment in gross.

### 2.    Right to Sue for Past Infringement

Defendants also argue that Plaintiff—the assignee of the rights—cannot sue for pre-assignment infringement because the right to sue for pre-assignment infringement was not expressly assigned.  In general, pre-assignment damages are allowed "only when the right to sue is clearly spelled out in a valid assignment." *H & J Foods, Inc. v. Reeder*, 477 F.2d 1053, 1056 (9th Cir. 1973) (citing *George W. Luft Co., Inc. v Zande Cosmetic Co., Inc.*, 142 F.2d 536 (2d Cir. 1944).  If the assignor transfers all its assets to the assignee, however, existing causes of action for trademark infringement are also transferred.  *Luft*, 142 F.2d at 541-42; *accord Ricks v. BMEzine.com, LLC*, 727 F.Supp.2d 936, 958 (D. Nev. 2010) (noting that a sale of all an assignor's assets to the assignee "necessarily would include the right to sue for past infringements").  The assertions in Konovalov's declaration show at least a dispute of material fact as to whether Plaintiff is now the successor to all the assets of Western Graphics, Pocketbook USA, and Batmore Capital.  For this reason, the Court concludes that Defendants have not demonstrated that Pocketbook's claims for pre-assignment infringement fail as a matter of law.

### 3.    Priority

Defendants argue it is the senior mark holder, because Pocketbook's first trademark registration is invalid.  The Court has already concluded that a disputed issue of material fact remains as to the validity of Pocketbook's first mark.  The Court therefore need not address Defendants' argument regarding priority.

---

use the declaration to support his or her position." *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015).

### 4.    Likelihood of Confusion

To determine whether a likelihood of confusion exists between the original trademark and the allegedly infringing product, courts apply eight factors. *GoTo.Com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204 (9th Cir. 2000); *see also AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). "The eight factors are: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012). These factors "are intended as an adaptable proxy for consumer confusion, not a rote checklist." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011). "[S]ome factors—such as the similarity of the marks and whether the two companies are direct competitors—will always be important," but the relative importance of each individual factor will be case-specific. *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999); *see also Network Automation*, 638 F.3d at 1149 (stating that "each factor [is assigned] appropriate weight in accordance with its relevance to the factual circumstances presented").

Likelihood of confusion is generally a question of fact, but where "a court can conclude that the consumer confusion alleged by the trademark holder is highly unlikely by simply reviewing the product listing/advertisement at issue, summary judgment is appropriate." *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 939 (9th Cir. 2015).

The third and fifth factors weigh in favor of finding a likelihood of confusion. The marks are similar, in that they both contain the word "Pocketbook." Defendants rely heavily on Pocketbook's disclaimer of "pocket book" in its first trademark application. But in a composite word and design mark, "the dominant portion of a composite word and design mark is the literal portion," *i.e.*, the word that makes up the mark, "even where the

-15-

literal portion has been disclaimed." *In re Viterra Inc.*, 671 F.3d 1358, 1366 (Fed. Cir. 2012). Both Pocketbook and Defendants also rely heavily on the internet for marketing.

The factors that consider the similarity of the products themselves weigh, however, against finding a likelihood of confusion. Most importantly, Pocketbook and Defendants are in entirely different industries: Pocketbook sells e-readers, and Defendants sell online tools for financial services providers. Likewise, the eighth factor weighs heavily against finding a likelihood of confusion: Defendants have disclaimed any intent to expand into e-readers, Ancevski Decl. ¶ 8, and there is no indication in the record that this is likely to change. Pocketbook has provided evidence of confusion in that publications have accidentally linked to Pocketbook.com instead of Pocketbook's website when writing about Pocketbook, but this is not evidence of confusion between the *marks*, only evidence of confusion about Pocketbook's web address. Pocketbook has not presented any other evidence of actual confusion, likely because actual confusion would be implausible.

Pocketbook's mark is not especially strong. To determine the strength of a mark, courts in the Ninth Circuit locate the mark along a continuum ranging from "generic" to "fanciful." *Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601, 605 (9th Cir. 1987). "Descriptive" and "suggestive" marks are relatively "weak" marks. *Id.* (citing *Sleekcraft*, 599 F.2d at 349). A descriptive mark is one that "specifically describes a characteristic or ingredient of an article or service (*i.e.*, 'Park 'N Fly')." A suggestive mark "suggests, rather than describes, an ingredient, quality or characteristic [of the product] (i.e., Sleekcraft)." *Id.*

Pocketbook argues its mark is suggestive, whereas Defendants contend it is merely descriptive.[11] A descriptive mark holder must show "secondary meaning," an association established in consumers' minds between the mark and the product, to receive protection. *Nutri/System*, 809 F.2d at 605. The holder of a suggestive mark, on the other hand, "will

---

[11] Pocketbook calls its mark "at least" suggestive, but makes no argument that it is arbitrary or fanciful as applied to e-readers.

receive protection if the infringing mark is quite similar and the goods or services they connote are closely related." *Id.* (citing *Sleekcraft*, 599 F.2d at 350). Even if Pocketbook's mark is suggestive and not descriptive, there is no question that the goods and services Pocketbook's and Defendants' trademarks connote are not closely related.

Although consumers searching online for Pocketbook are not likely to exercise great care in choosing whether to click on Pocketbook.com, a customer's error in clicking on the wrong link will be readily apparent. Pocketbook suggests that confusion might arise if a consumer visits Pocketbook.com and assumes, wrongly, that Pocketbook no longer exists. Pocketbook cites to *Brookfield* for this idea. 174 F.3d at 1057. But in that case, the Ninth Circuit acknowledged that confusion might arise if a consumer searching for a "MovieBuff" database wrongly believed the database no longer existed and had been replaced with a different entertainment database. *Id.* The court also explained that a consumer who arrived at the wrong website (the junior database) might be content to stay, and thereby profit off the goodwill developed by the senior database. *Id.* In this case, the dissimilarity of the products makes it unlikely that a consumer searching for Pocketbook would visit Pocketbook.com and believe Pocketbook had been replaced by Refinance Mortgage. It is similarly unlikely that a user searching for an e-reader would instead be content with Defendants' mortgage-calculating widgets.

Finally, Pocketbook has presented evidence that Defendants chose their web address in order to cause confusion. Pocketbook.com once contained links to purchase e-readers from Pocketbook's competitors, suggesting that Defendants (or, as Defendants argue, the algorithm that determined which ads were displayed) purchased the domain name with the intent to cause confusion. Yet, Defendants' use of their domain name is not the same as their use of their trademark.

The Court concludes that the majority of the factors weigh against finding a likelihood of confusion. Because Pocketbook's and Defendants' products are so dissimilar, there is nothing that would cause confusion here except Defendants' use of the domain name Pocketbook.com as the web address for Defendants' site, which is more properly

addressed in an ACPA claim.  The Court therefore **GRANTS** Defendants' MSJ as to Pocketbook's trademark infringement claim.  Because Pocketbook's Lanham Act unfair competition claim, common law trademark infringement claim, and UCL claim also require a likelihood of confusion, the Court **GRANTS** Defendants' MSJ as to those claims as well.  Because the Court grants Defendants' MSJ as to Pocketbook's trademark infringement claim, the Court need not consider Defendants' laches affirmative defense.

**B.    ACPA Claim**

Defendants argue that, because Defendants' registration of Pocketbook.com precedes Pocketbook's trademark applications, Pocketbook's ACPA claim fails as a matter of law.

A person shall be liable to the owner of a trademark under the ACPA if the person "has a bad faith intent to profit from that mark" and "registers, traffics in, or uses a domain name that in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark" or is a statutorily protected trademark, like Red Cross or United States Olympic and Paralympic Committee.  15 U.S.C. § 1125(d)(1).  The Ninth Circuit has determined that in section 1125(d)(1), "at the time of registration" refers to the time of a first registration.  *GoPets Ltd. v. Hise*, 657 F.2d 1024, 1031-32 (9th Cir. 2011).  The court reasoned that any other understanding of the statutory language "would make rights to many domain names effectively inalienable."  *Id.* at 1032. The court therefore reversed the district court's holding that re-registration of a domain name could constitute a violation of the ACPA.

Here, Pocketbook.com was undisputedly registered in 1997, long before Pocketbook's use of either of its trademarks.  Defendants acquired the domain name in 2010.  Under *GoPets*, there is no question that Defendants' re-registration did not constitute a violation of the ACPA.

Pocketbook argues that, where evidence of bad faith arises after registration, any subsequent re-registrations (such as Defendants' re-registration in 2019) constitute a

violation of the ACPA.  Pocketbook's argument runs counter to the Ninth Circuit's holding in *GoPets* and to the plain language of the statute.

One of the defendants in *GoPets* was an individual, Edward Hise, who had registered the domain name gopets.com in 1999.  657 F.2d at 1027.  The plaintiff in *GoPets* was the holder of a service mark, "GoPets," that was undisputedly distinctive in 2004, when the plaintiff began to inquire about purchasing gopets.com from Hise.  On November 12, 2006, Hise and his brother began to register domain names similar to gopets.com, such as gopet.mobi and gopets.name.  On December 14, 2006, Hise transferred ownership of gopets.com to a corporation he controlled.  *Id.* at 1027-29.  The plaintiff sued, and the district court granted summary judgment in favor of the plaintiff on his ACPA claims alleging cybersquatting with respect to gopets.com and the other domain names Hise had registered in November 2006.  *Id.* at 1029.

On appeal, the Ninth Circuit reversed the district court's grant of summary judgment as to the ACPA claim for gopets.com, as discussed *supra*.  The Ninth Circuit affirmed, however, with respect to the other domain names, concluding there was "ample evidence in the record on which to base a finding of bad faith."  *Id.* at 1032.  Even though the Ninth Circuit found there was "ample evidence" of bad faith on November 12, 2006, the court still concluded that Hise's transfer (and the corporation's re-registration) of the gopets.com domain name on December 14, 2006 did not violate the ACPA.

The only logical understanding of the Ninth Circuit's reasoning is that the time of *initial registration* is the only time an ACPA bad faith claim will arise.  The text of the ACPA's cyberpiracy provision accords with the Ninth Circuit's interpretation.  The ACPA makes distinctiveness at the time of registration of the domain name a condition for liability.  If distinctiveness at the time of re-registration constitutes distinctiveness at the time of registration, as Pocketbook argues is the case in other circuits, then bad faith that arises after the initial registration may give rise to a new ACPA claim.  But in this circuit, where distinctiveness at the time of registration means at the time of initial registration,

distinctiveness at the time of initial registration is a condition for liability, and bad faith that arises after initial registration will not give rise to ACPA liability.

Here, Pocketbook.com was registered in 1997, long before Pocketbook began to use either of its marks. The Court therefore **GRANTS** Defendants' MSJ as to Pocketbook's ACPA claim.

## C.   Cancellation of Trademark

Pocketbook contends that Defendants' trademark in Pocketbook.com should be cancelled because it was procured by fraud. A plaintiff can succeed on a claim for cancellation based on fraud if she can establish five elements:

> (1) a false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false; (3) the registrant's intent to induce reliance upon the misrepresentation; (4) actual, reasonable reliance on the misrepresentation; and (5) damages proximately caused by that reliance.

*Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013) (citing *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir.1990)). The proponent of a claim for cancellation bears a "heavy burden." *Id*.

Pocketbook argues that Defendants attached a fake business card to their trademark application. Pocketbook makes this argument based on Defendants' representation that a company called Vistaprint printed the business card Defendants included with their trademark application, yet in response to a subpoena, Vistaprint stated it had no records of Defendants ever having placed an order. *See* Opp. at 11. Defendants have attached to their Reply a statement showing a Vistaprint charge on Ancevski's credit card in 2012, rebutting Vistaprint's statement that it had no record of Defendants having placed an order. This is Defendants' MSJ, not Pocketbook's, but the Court concludes that Defendants have

adduced evidence showing a factual dispute as to whether Defendants included a material falsehood in their trademark application.[12]

**D.    Motion to Continue**

Pocketbook filed its motion on December 3, 2021, and seeks to extend the case schedule by three months in order to conduct additional discovery relating to Defendants' counterclaim for abandonment of trademark and Pocketbook's allegations of fraud on the USPTO. Because the non-expert discovery deadline was December 14, 2021, the Court construes Pocketbook's motion as a motion to reopen discovery. When ruling on a motion to amend a Rule 16 scheduling order to reopen discovery, courts in this circuit consider six factors:

> 1) whether trial is imminent, 2) whether the request is opposed, 3) whether the non-moving party would be prejudiced, 4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, 5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and 6) the likelihood that the discovery will lead to relevant evidence.

*City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1066 (9th Cir. 2017) (quoting *United States ex rel. Schumer v. Hughes Aircraft*, 63 F.3d 1512, 1526 (9th Cir. 1995), *vac'd on other grounds*, 520 U.S. 939 (1997)).

On balance, the factors weigh in favor of granting Pocketbook's motion to extend the schedule. All jury trials in the Central District have been suspended until February 28, 2022 due to the Omicron upsurge. Even if jury trials resume on March 1, criminal jury

---

[12] Pocketbook also emphasizes that Defendants improperly use the trademark registration symbol next to the word "Pocketbook," rather than Defendants' trademarked "Pocketbook.com," on Defendants' website. Pocketbook argues this alleged misuse serves as an independent basis for cancellation of Defendants' trademark. Because Pocketbook has not moved for summary judgment, the Court need not address whether Pocketbook is correct that such misuse would be the basis for cancellation of Defendants' trademark.

trials will have priority over civil trials.  The COVID-19 pandemic has severely impacted civil jury trials in this district, and the trial is this matter is unlikely to take place on April 19, 2022 as currently scheduled.  Trial is therefore not imminent.

Defendants argue Pocketbook was not diligent in taking discovery, and delayed serving discovery requests until September 2021, a year after Pocketbook's complaint was filed.  Pocketbook's counsel asserts, however, that he waited until the Court had ruled on Pocketbook's motion to strike before taking discovery on those counterclaims, and that he attempted to stipulate to continue the discovery deadlines shortly after the Court issued its order on the motion to strike, when it became clear Pocketbook would need additional time. Pocketbook also asserts that, after meeting and conferring, Pocketbook expected Defendants to supplement their discovery responses, and did not learn until late November 2022 that Defendants did not intend to supplement their responses, at which time it was too late for Pocketbook to timely move to compel responses.

The Court's order on Plaintiff's motion to strike also goes to the fifth factor, the foreseeability of the need for additional discovery.  The claims on which the parties were to conduct discovery were not clear until November 9, 2021, when Defendants declined to amend their counterclaims.  Pocketbook could not have foreseen this at the time the Court entered its Scheduling Order in July 2021.

Pocketbook does not describe the additional discovery it seeks to take, so it is difficult to say whether an extension of time is likely to lead to relevant evidence.  This factor is therefore neutral.

The two factors weighing against reopening discovery are the second and third. Defendants oppose the extension Pocketbook seeks, primarily based on Pocketbook's purported lack of diligence.  Defendants also assert they will be prejudiced by the cost of continued discovery.  Defendants do not identify, however, any reason why continued discovery would be especially burdensome here (especially in light of the Court's narrowing of the issues with this Order).  The Court also notes that in the last six weeks, both Pocketbook and Defendants have each filed their own opposed *ex parte* application

-22-

seeking to continue a deadline by just one week, and that both sides' briefs on this motion devote significant time to accusations regarding the other side's purported delays and obstructions to the discovery process.  The exercise of a modicum of courtesy, common sense, and professionalism would help conserve the parties' resources as well as judicial resources in the resolution of this action.

In light of the foregoing, Plaintiff's motion to extend the case schedule is **GRANTED**.

**E.    Pocketbook's Request to Deny Defendants' MSJ Pursuant to Rule 56(e)**

Pocketbook, in its Opposition, asks the Court to deny Defendants' MSJ on the basis that Pocketbook has been unable to obtain the evidence it needs to oppose Defendants' MSJ.  There is no evidence Pocketbook could obtain, however, that would alter the Court's rulings herein regarding likelihood of confusion and Pocketbook's ACPA claim.  The Court therefore **DENIES** Pocketbook's request.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

# VII.

## CONCLUSION

In light of the foregoing,

1. Defendants' MSJ is **GRANTED** as to Pocketbook's claims for trademark infringement, unfair competition, common law trademark infringement, California's UCL, and under the ACPA; and

2. Defendants' MSJ is **DENIED** as to Pocketbook's claim for cancellation of Defendants' trademark and as to Defendants' counterclaim for abandonment of trademark.

3. Pocketbook's Motion to Continue the Trial and Pre-trial Dates is **GRANTED**. The discovery cut-off is extended to March 15, 2022, and the trial is continued to July 19, 2022.  A separate order will issue with the amended dates and deadlines.

**IT IS SO ORDERED.**

DATED:  February 2, 2022

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE